UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| ROBIN WIEBERS, and DARIN WIEBERS,<br><br>Plaintiffs,<br><br>vs.<br><br>FARMERS MUTUAL HAIL INSURANCE COMPANY OF IOWA,<br><br>Defendant. | 4:17-CV-04126-RAL<br><br><br>OPINION AND ORDER ON PENDING MOTIONS |

Plaintiffs Robin Wiebers (Robin) and Darin Wiebers (Darin) (collectively the Wiebers) sued their insurance carrier Farmers Mutual Hail Insurance Company of Iowa (FMH) after FMH declined to pay its remaining underinsured motorist (UIM) coverage limit of $50,000 to the Wiebers. The Wiebers' complaint makes claims for breach of contract, first-party bad faith, intentional infliction of emotional distress, breach of fiduciary duty, and unfair or deceptive trade practices, and the Wiebers seek compensatory and punitive damages and attorney's fees. FMH filed a motion for partial summary judgment, Doc. 16, seeking summary judgment on all claims except the breach of contract claim, and a motion to bifurcate, Doc. 21, in the alternative to the extent this Court opts not to grant summary judgment on all non-contractual claims. For the reasons explained, this Court grants in part FMH's motion for partial summary judgment and bifurcates the contract claim for a separate trial preceding any other claim this Court might allow.

I.      **Facts**

Robin was driving home from work on June 15, 2016, lawfully traveling between 45 and 55 miles per hour, when another car, driven by Kerri Ann Latendresse, ran a stop sign and collided with Robin's vehicle. Doc. 17 at ¶¶ 1–2; Doc. 26 at ¶¶ 1–2; Doc. 27-2 at 20. Robin was badly injured in the accident and taken by ambulance to a hospital in Sioux Falls. Doc. 17 at ¶ 3; Doc. 26 at ¶ 3; Doc. 27-2 at 6.

An emergency room doctor diagnosed Robin with a fractured right ankle and a broken rib. Doc. 32-1 at 1; Doc. 17 at ¶ 3; Doc. 26 at ¶ 3; Doc. 27-2 at 5. The ankle had punctured Robin's skin and she would later testify that the injury was "extremely, extremely painful." Doc. 27-2 at 7; see also Doc. 32-1 at 1. Robin underwent surgery on her ankle, with metal hardware being inserted to repair the fracture. Doc. 26 at ¶ 3; Doc. 27-2 at 6–7, 11. Robin took prescription pain medication for two weeks after the accident and ibuprofen thereafter to control her pain. Doc. 26 at ¶ 3; Doc. 27-2 at 8–10. Robin missed a full month from her job as an assistant dean at the University of South Dakota's School of Education and had to use a wheelchair, scooter, and crutches to get about during her recovery. Doc. 26 at ¶ 3; Doc. 27-2 at 3, 7–8, 27. Robin's family doctor eventually prescribed medication for what she suspected was arthritis in Robin's right ankle. Doc. 26 at ¶ 3; Doc. 27-2 at 10. Robin testified that in the summer of 2017, approximately one year after the accident, she still had "chronic" and "constant" ankle pain as well as difficulty going up and down steps and walking on uneven ground. Doc. 26 at ¶ 3; Doc. 27-2 at 11. In short, Robin testified to life-altering injuries from the car accident.

Robin also testified that the accident injured her neck, causing her pain in the neck and shoulder area and numbness in her fingers. Doc. 26 at ¶ 3; Doc. 27-2 at 5, 17–18. She had some injections for neck pain in October 2016, but at least through August 2018 appears not to have received any treatment for her neck since October 2016. Doc. 26 at ¶ 3; Doc. 27-2 at 18–19.

At the time of the accident, Progressive Northern Insurance Company (Progressive) insured Latendresse, with liability limits of $250,000. Doc. 17 at ¶ 3; Doc. 26 at ¶ 3. The Wiebers had $300,000 in UIM coverage with FMH. Doc. 17 at ¶ 3; Doc. 26 at ¶ 3. Under South Dakota law, "[u]nderinsured motorist coverage allows the insured to collect the amount of that insured's own coverage less the amount of the tortfeasor's liability coverage." Kirchoff v. Am. Cas. Co. of Reading, 997 F.2d 401, 402 n.2 (8th Cir. 1993) (cleaned up and citation omitted); SDCL § 58-11-9.5. Accordingly, FMH's UIM exposure was $50,000—the $300,000 UIM coverage limit minus the $250,000 liability limit of Progressive.

Kevin Templeton, an FMH claims adjuster, called Robin on June 21, 2016. Doc. 17 at ¶ 6; Doc. 26 at ¶ 6. He notified her of the $10,000 medical payment benefit under the FMH policy and began adjusting the property damage claim. Doc. 17 at ¶ 6; Doc. 26 at ¶ 6. FMH received medical bills for Robin on July 13, 2016, and paid the $10,000 medical payment benefit to Sanford Hospital the next day. Doc. 17 at ¶ 7; Doc. 26 at ¶ 7. FMH's file reflects that it had over one hundred pages of Robin's medical records by July 14, 2016. Doc. 26 at ¶ 7; Doc. 27-7.

Deborah Beeler, another FMH claims adjuster, contacted Robin on July 18, 2016, to discuss the loan on her damaged vehicle. Doc. 17 at ¶ 8; Doc. 26 at ¶ 8. Beeler investigated the matter and contacted Wells Fargo that day to obtain a pay-off amount. Doc. 17 at ¶ 8; Doc. 26 at ¶ 8. On July 20, 2016, FMH issued a check to Wells Fargo to pay off the vehicle loan and sent another check to Robin for her equity in the vehicle. Doc. 17 at ¶ 8; Doc. 26 at ¶ 8.

Robin called Beeler on August 16, 2016, to discuss the claims process. Doc. 17 at ¶ 9; Doc. 26 at ¶ 9. She was concerned that her own health insurance carrier was paying her medical bills, but Beeler assured her that this was normal, and that the health insurance carrier would be reimbursed through subrogation. Doc. 17 at ¶ 10; Doc. 26 at ¶¶ 9–10; Doc. 20-1 at 8. Robin said

she was confused by the claims process and not sure whether she needed an attorney, and Beeler explained that hiring an attorney was Robin's choice. Doc. 17 at ¶ 11; Doc. 26 at ¶ 11; Doc. 20-1 at 8. FMH's claims notes from this discussion show that Robin had signed a HIPPA authorization[1] (presumably not for FMH) by August 16, 2016. Doc. 26 at ¶ 9; Doc. 20-1 at 8. The notes from August 2016 also show that FMH knew Progressive's limits were $250,000 and that Robin's medical bills were at least $72,558.26, but might be as much as $140,000. Doc. 26 at ¶ 9; Doc. 20-1 at 7–8.

After the Wiebers retained counsel, the Wiebers' attorney on November 14, 2016, sent a letter to FMH that began:

> I am representing Robin and Darin Wiebers concerning Robin's motor vehicle accident on June 15, 2016. Although I am seeking confirmation, it is my understanding that the responsible driver, Kerri Latendresse, had insurance with Progressive Northern Insurance Company with limits of $250,000. Perhaps you have already confirmed those limits.
> It is also my understanding that there is available from your company an additional $50,000[2] in underinsured motorist coverage. Please confirm that UIM coverage.

Doc. 20-2 at 1. The letter then detailed the Wiebers' damages, including roughly $87,000 in past medical expenses, $6,254.06 in lost income, and prejudgment interest on those amounts. Doc. 20-2 at 2–3; Doc. 17 at ¶ 12; Doc. 26 at ¶ 12. Describing Robin's injuries as "life changing," the Wiebers' attorney predicted that a jury would award her "several hundred thousand dollars" for pain and suffering and loss of enjoyment of life. Doc. 20-2 at 3. As for future damages, the

---

[1] Beeler's claims notes state: "She [meaning Robin] has not signed any release from Progressive at this time. She has signed a HIPPA authorization." Doc. 20-1 at 8. The record is unclear for what entity a HIPPA authorization was signed, but Robin's counsel's letter of March 10, 2017, indicates at that time Robin was willing to provide an authorization for release of medical records to FMH as she had provided to Progressive. Doc. 20-5.

[2] Fifty thousand dollars represented the extent of FMH's UIM exposure under South Dakota law because Latendresse had $250,000 in liability insurance and the Wiebers had $300,000 in UIM coverage. See SDCL § 58-11-9.5; Kirchoff, 997 F.2d at 402 n.2.

attorney wrote that Robin had suffered a disk injury in her neck and had been told that there "is the likelihood of future surgery." Doc. 20-2 at 4. He also claimed that Robin would need ankle surgery, either to remove the hardware or replace her ankle. Doc. 20-2 at 4. Although the attorney had yet to obtain estimates for Robin's future medical expenses, he opined that the cost of neck surgery, hardware removal, and a potential ankle replacement could range anywhere from $100,000 to $225,000. Doc. 20-2 at 4. The attorney included records from Robin's health insurer with the letter, but did not provide any medical or lost income records. Doc. 17 at ¶ 12; Doc. 26 at ¶ 12. The letter concluded with the following paragraph:

> I am attempting to confirm payment of the policy limits by Progressive National Insurance Company. Please confirm that I am willing to accept those policy limits on behalf of your insured and that you will also pay your underinsured motorist limits. Again, I don't think there is any question under good faith and fair dealing that those UIM limits are due and owing. I would hope to hear back from you regarding payment of those limits within the next 20 days.

Doc. 20-2 at 4. FMH did not respond to the November 2016 letter despite the attorney's request that it do so within twenty days. Doc. 26 at ¶ 12; Doc. 20-2 at 4.

Beeler wrote a claims note in December 2016 recognizing that Robin's attorney had requested $50,000 in UIM coverage. Doc. 20-1 at 5. The note also stated: "Adjust Collision reserve from $90.48 to $0.00. Increase the sub reserve for collision to $12,000 and sub medpay for $10,000.00. Increase BIUI to $50,000 based on the medical bills, lost wages, out of packet [sic] expenses and general damages." Doc. 20-1 at 5. In Robin's view, this note shows that FMH realized that her damages would exceed Progressive's liability coverage. Doc. 25 at 6. FMH disagrees, asserting that the note reflects "an adjustment of the reserves because of how South Dakota allocates UIM coverage with a credit for the underlying policy limits." Doc. 30 at 4. FMH

filed an affidavit from Beeler saying that she had simply increased the reserves and that the reserves "are not an indication of what a case is worth or valued at." Doc. 31 at ¶ 2.

The Wiebers' attorney sent FMH a letter on January 31, 2017, explaining that Progressive would pay Robin the $250,000 policy limits if FMH approved this settlement and waived its subrogation claim under the Schmidt/Clothier procedure.[3] Doc. 17 at ¶ 13; Doc. 26 at ¶ 13; Doc. 20-3 at 1. He wrote that FMH had thirty days to either pay its UIM limit or substitute its draft for the payment from Progressive. Doc. 20-3 at 1. If FMH did neither, the Wiebers' attorney explained, "we will proceed as though you have waived your right of subrogation, and we will have our clients execute a full Release with the tortfeasor, Kerri Latendresse." Doc. 20-3 at 1–2.

Beeler wrote the Wiebers' attorney on February 8, 2017, requesting copies of all medical bills and records concerning the accident and documentation supporting the lost wages claim. Doc. 17 at ¶ 14; Doc. 26 at ¶ 14; Doc. 20-4. She explained that FMH needed this information before it could decide whether to waive its subrogation rights. Doc. 20-4.

The Wiebers' attorney did not respond to Beeler until a March 10, 2017 letter. Doc. 17 at ¶ 15; Doc. 26 at ¶ 15; Doc. 20-5. He wrote that Robin would sign a medical authorization if FHM sent one, even though he had already provided FMH with information about Robin's bills and damages in his November 2016 letter. Doc. 17 at ¶ 15; Doc. 26 at ¶ 15; Doc. 20-5. He also asked

---

[3]The Schmidt/Clothier procedure derives its name from a Minnesota Supreme Court decision which sought to balance the rights and interests of an insurance carrier and an insured seeking UIM benefits from the insurance carrier. Tripp v. W. Nat'l Mut. Ins. Co., 664 F.3d 1200, 1203 n.2 (8th Cir. 2011). Because of its subrogation rights against tortfeasors who caused a motor vehicle accident, an insurance carrier with UIM exposure is entitled to receive notice from the insured of any proposed settlement or resolution that may compromise subrogation rights. Id. The insurance carrier then has the choice to consent to the resolution or to substitute its own check thereby paying the insured the underlying liability limits. Id. If the insurance carrier substitutes its check, it preserves subrogation rights against the underinsured motorist and the motorist's liability carrier. Id. South Dakota has adopted the Schmidt/Clothier procedure. Id.; Dziadek v. Charter Oak Fire Ins. Co., 213 F. Supp. 3d 1150, 1163 n.7 (D.S.D. 2016).

FMH to decide whether to waive subrogation or substitute its draft. Doc. 17 at ¶ 15; Doc. 26 at ¶ 15; Doc. 20-5.

Beeler emailed the Wiebers' attorney on March 16, 2017, writing that she was considering the March 10 letter but that she had not been able to gather the necessary decision makers because it was the week of spring break. Doc. 17 at ¶ 16; Doc. 26 at ¶ 16; Doc. 20-6. On March 23, 2017, Beeler forwarded a medical authorization and a letter stating that FMH would waive its "medpay subrogation right" and that the Wiebers could accept the settlement with Progressive. Doc. 17 at ¶ 16; Doc. 26 at ¶ 16; Doc. 20-7.

The Wiebers' attorney emailed Beeler on April 3, 2017, asking her to confirm that FMH agreed to waive all of its subrogation rights, not just the medpay subrogation right Beeler mentioned in her March 23 letter. Doc. 27-3; Doc. 26 at ¶ 16. He also noted that he was attaching Robin's medical records and bills that Progressive had gathered. Doc. 27-3; Doc. 26 at ¶ 16. Beeler confirmed the following day that FMH waived all of its subrogation rights. Doc. 20-15. Doc. 17 at ¶ 17; Doc. 26 at ¶ 17. Thus, the waiver of FMH's subrogation rights and right to substitute its draft occurred about 65 days after the January 31, 2017 notice of Progressive having tendered liability limits, and that time included a 30-day delay in the Wiebers' attorney responding to FMH's February 8, 2017 letter.

FMH received Robin's medical authorization on April 17, 2017, along with a letter from the Wiebers' attorney opining that the medical records he had forwarded should be enough for FHM to resolve Robin's UIM claim. Doc. 17 at ¶ 18; Doc. 26 at ¶ 18; 20-8. Beeler replied by email, explaining that FMH was reviewing Robin's records and would get back to her attorney once this was done. Doc. 17 at ¶ 18; Doc. 26 at ¶ 18; 20-8 at 4.

On April 20, 2017, FMH sent Robin's medical records to ReMed Casualty Consultants (ReMed) for a nurse to review. Doc. 17 at ¶ 19; Doc. 26 at ¶ 19. The ReMed nurse replied the next day, saying that she needed some additional records to complete the review but that the records she did have showed a "high probability" of arthritis in the ankle and that future surgery could be necessary.[4] Doc. 17 at ¶ 20; Doc. 26 at ¶¶ 19–20; Doc. 20-1 at 3.

Beeler wrote the Wiebers' attorney on May 11, 2017, explaining that FMH was still gathering Robin's medical records for the review. Doc. 17 at ¶ 21; Doc. 26 at ¶ 21; Doc. 20-9. The Wiebers' attorney emailed Beeler that same day, saying that the Wiebers had given FMH ample opportunity to review the claim and asking whether litigation would be necessary. Doc. 26 at ¶ 16; Doc. 27-3 at 3.

On June 1, 2017, ReMed informed FMH that it had now gathered the necessary medical records and that its review should be complete by June 23, 2017. Doc. 17 at ¶¶ 22–23; Doc. 26 at ¶¶ 22-23; Doc. 20-1 at 2. Beeler updated the Wiebers' attorney on the status of Robin's claim that same day. Doc. 17 at ¶ 23; Doc. 26 at ¶ 23; Doc. 20-1 at 2.

FMH received the ReMed review on June 26, 2017. Doc. 17 at ¶ 24; Doc. 26 at ¶ 24; Doc. 20 at ¶ 21. ReMed stated that Robin had past medical bills of approximately $87,000 and an estimated wage loss of $6,254.06, although the Wiebers had not provided any documents from Robin's employer verifying her salary and the dates she missed. Doc. 17 at ¶ 24; Doc. 26 at ¶ 24; Doc. 20-11 at 5, 10. ReMed predicted that Robin could incur $46,000 in future medical expenses ($6,000 for removal of the hardware from her ankle and $40,000 for an ankle fusion surgery)[5] and

---

[4] One of Robin's briefs to this Court advised that surgery to remove the hardware from her ankle was scheduled for May 21, 2019. Doc. 25 at 4.

[5] The ReMed report does not say whether the $46,000 in future medical expenses represents the full cost of the potential surgeries or the contractually discounted amount Robin's insurer would pay. On June 18, 2019, Robin filed a letter from Sanford Health estimating that the surgery to remove the hardware from her ankle would cost $14,284. Doc. 35-1. Robin averred that this

a future wage loss of $2,500.[6] Doc. 17 at ¶ 24; Doc. 26 at ¶ 24; Doc. 20-11 at 6; Doc. 20-1 at 2. ReMed's future medical expense prediction did not include expenses for future neck surgery. Its nurse opined that preexisting degenerative issues caused Robin's neck problem, although she acknowledged that the accident could have caused a "short-term" aggravation of Robin's pain. Doc. 20-11 at 5. Altogether, the past and future medical bills and past and estimated future lost income totaled $141,709.62.

Beeler states that she and her supervisor Marty Mortvedt reviewed the ReMed report and the documents provided by the Wiebers. Doc. 17 at ¶ 25; Doc. 26 at ¶ 25; Doc. 20 at ¶ 22. They concluded that Robin's UIM claim was worth less than the $260,000 the Wiebers had received from Progressive and FMH's waiver of the $10,000 medical payments. Doc. 17 at ¶ 25; Doc. 26 at ¶ 25; Doc. 20 at ¶ 22. They based this decision on medical records from late July 2016 showing that the right ankle was in alignment and healing, imaging studies of Robin's neck from August 2016, and the ReMed nurse's opinion that Robin's neck problem stemmed from preexisting degenerative issues. Doc. 17 at ¶ 26; Doc. 26 at ¶ 26; Doc. 20 at ¶ 22; Doc. 20-11 at 5.

Beeler informed the Wiebers of FMH's decision in a June 26, 2017 letter. Doc. 17 at ¶ 27; Doc. 26 at ¶ 27; Doc. 20-12. She wrote that while Robin's medical bills totaled nearly $87,000, the "related charges" for the accident were only $43,548.46 after "contractual adjustments." Doc. 17 at ¶ 27; Doc. 26 at ¶ 27; Doc. 20-12. This reference to "contractual adjustments" apparently came from the ReMed report, which stated that Robin's medical insurer had paid only $43,548.46

---

amount does not include the cost of physical therapy she will need after the surgery and that her health insurer will not pay for the surgery or any other treatment for her ankle until she exhausts the settlement she received. Doc. 35 at ¶¶ 2–3. Of course, FMH did not have this estimate from Sanford Health back when it was evaluating Robin's claim for UIM benefits.

[6]The parties agree that the ReMed report estimates a future lost income of $2,500, Doc. 17 at ¶ 24, Doc. 26 at ¶ 24, although that is not apparent from the ReMed report. Notation of estimate of the $2,500 in future lost income does appear in Beeler's claims notes describing the report. Doc. 20-1 at 2.

in medical bills because of agreements for discounts with Robin's healthcare providers. Doc. 20-11 at 6–10. Beeler concluded the letter by writing "[w]e certainly understand the inconvenience this accident may have caused; however, based on the expenses reported, potential charges, and the settlement from Progressive, we feel the bodily injury settlement of $250,000 with Progressive fully compensates your client for her injuries and inconveniences." Doc. 20-12.

The Wiebers' attorney sent FMH a letter on July 6, 2017, threatening litigation if FMH did not reconsider its position. Doc. 17 at ¶ 28; Doc. 26 at ¶ 28; Doc. 20-13. Beeler replied on August 30, 2017, advising that FMH had not changed its position but that it was "offering the Arbitration clause" in the policy since the parties disagreed. Doc. 17 at ¶ 29; Doc. 26 at ¶ 29; Doc. 20-14. The Wiebers' attorney responded that arbitration provisions in insurance contracts are unenforceable and that the Wiebers would proceed with litigation. Doc. 26 at ¶ 29; Doc. 27-3 at 4.

The Wiebers filed this suit in mid-September 2017, alleging claims for breach of contract (Count I); bad faith (Count II); intentional infliction of emotional distress (Count III); breach of fiduciary duty (Count IV); unfair or deceptive trade practices (Count V); punitive damages (Count VI); and attorney's fees (Count VII). Doc. 1. FMH moved for summary judgment on Counts II through VII, but not on Count I. Doc. 16. It also moved to bifurcate Count I from Counts II through VII if any of Counts II through VII survived summary judgment. Doc. 21.

## II. Analysis

### A. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the

evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612

F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Mortg. & Fin., Inc., 445 F.3d 1106,

1109 (8th Cir. 2006)). There is a genuine issue of material fact if a "reasonable jury [could] return

a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d

789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary

judgment must cite to particular materials in the record supporting the assertion that a fact is

genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d

1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence beyond

the nonmoving party's own conclusions, are insufficient to withstand a motion for summary

judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007). Summary judgment is not "a

disfavored procedural shortcut, but rather. . . an integral part of the Federal Rules as a whole, which

are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex

Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

### B. Count II: Bad Faith

First-party bad faith is an intentional tort that "typically occurs when an insurance company

consciously engages in wrongdoing during its processing or paying of policy benefits to its

insured." Hein v. Acuity, 731 N.W.2d 231, 235 (S.D. 2007). The oft-repeated test for bad faith

under South Dakota law requires the plaintiff to show (1) an absence of a reasonable basis for

denial of policy benefits; and (2) knowledge or a reckless disregard of the lack of a reasonable

basis for the denial. Phen v. Progressive N. Ins. Co., 672 N.W.2d 52, 59 (S.D. 2003); Anderson

v. W. Nat'l Mut. Ins. Co., 857 F. Supp. 2d 896, 903–04 (D.S.D. 2012). Despite the phrasing of

this test, first-party bad faith claims in South Dakota "can extend to situations beyond mere denial

of policy benefits." Dakota, Minn. & E. R.R. Corp. v. Acuity, 771 N.W.2d 623, 629 (S.D. 2009)

(citation omitted). "A bad faith claim in South Dakota may be based on a failure to comply with a duty under the insurance contract, but still must involve an insurance company consciously engaging in wrongdoing." Anderson, 857 F. Supp. 2d at 904 (cleaned up and citations omitted); see also Hein, 731 N.W.2d at 235 ("[A] frivolous or unfounded refusal to comply with a duty under an insurance contract constitutes bad faith.").

An insurer has a reasonable basis for denying benefits—and therefore cannot be liable for bad faith—if the claim is "fairly debatable" in either law or fact. Dakota, Minn. & E. R.R., 771 N.W.2d at 630 ("If an insured's claim is fairly debatable . . . an insurer cannot be said to have denied the claim in bad faith." (citation omitted)); Phen, 672 N.W.2d at 59 (explaining that an insurance company is liable for bad faith "only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis"). The "fairly debatable" standard focuses "on the existence of a debatable issue, not on which party was correct." Dakota, Minn. & E. R.R., 771 N.W.2d at 630 (citation omitted). Thus, an insurer is not guilty of bad faith simply because its decision to deny benefits was mistaken. Id.; Isaac v. State Farm Mut. Auto. Ins. Co., 522 N.W.2d 752, 759 (S.D. 1994) ("Bad faith actions . . . must be predicated on more than the negligence of another."). Whether an insurer acted in bad faith is "determined based upon the facts and law available to the insurer at the time it made the decision to deny coverage." Dakota, Minn. & E. R.R., 771 N.W.2d at 629 (cleaned up and citation omitted). This question of bad faith is generally one for the finder of fact. Id. at 629–30.

The Wiebers assert that FMH's "failure to investigate" is the "crux of their bad faith claim." Doc. 25 at 15. They argue that FMH's conclusion would have been different had it "properly investigated their claim and considered all proper elements of damages." Doc. 25 at 15. An insurer's flawed investigation and consideration of a claim may justify a bad faith claim.

12

Hammonds v. Hartford Fire Ins. Co., 501 F.3d 991, 996 (8th Cir. 2007); Dakota, Minn. & E. R.R., 771 N.W.2d at 630 (explaining that the insurer's investigation is relevant to deciding whether a claim is fairly debatable); see also id. at 629 ("Bad faith conduct may include the failure to conduct a reasonable investigation concerning the claim."); Blanchard v. Mid-Century Ins. Co., 933 N.W.2d 631, 637 (S.D. 2019) ("First-party bad faith may also extend to situations beyond mere denial of policy benefits, including the failure to conduct a reasonable investigation as required by the insurance contract." (cleaned up and citation omitted)); Zochert v. Protective Life Ins. Co., 921 N.W.2d 479, 487 (S.D. 2018) ("Insurers must make a reasonable investigation of insurance claims before denying benefits."). For instance, courts will infer that the insurer knew of or recklessly disregarded the lack of a reasonable basis when the insurer is "indiff[erent] to facts or to proofs submitted by the insured." Zochert, 921 N.W.2d at 490 (citation omitted). By the same token, a claim may not be fairly debatable if "an insurer conducted an inadequate investigation of a claim, and, by doing so, failed to locate information indicating that the plaintiff was entitled to benefits." Anderson, 857 F. Supp. 2d at 904. And "[t]he same would be true if the insurer's reasons for questioning the validity of the plaintiff's claim, or arguing that the claim was fairly debatable, stemmed from the insurer's failure to investigate the claim." Id. at 904–05.

The Wiebers argue that FMH acted in bad faith because: 1) FMH's own notes reflect that FMH believed Robin's damages would exceed the liability coverage; 2) FMH never interviewed Robin or asked her to submit to an independent medical examination (IME); 3) FMH used the discounted amounts of Robin's medical bills rather than the face value a jury would consider; and 4) FMH failed to consider other allowable items of damages including pain and suffering, loss of enjoyment of life, aggravation, disability and disfigurement, future lost wages, loss of earning capacity, and loss of consortium. Doc. 25 at 16–17.

These assertions do not necessarily establish bad faith under the circumstances. First,

Beeler's claims notes may or may not show that Beeler thought Robin's claim was worth more

than Progressive's limits of liability. Again, Beeler's note at issue stated "Adjust Collision reserve

from $90.48 to $0.00. Increase the sub reserve for collision to $12,000 and sub medpay for

$10,000.00. Increase BIUI to $50,000 based on the medical bills, lost wages, out of packet [sic]

expenses and general damages." Doc. 20-1 at 5. Beeler filed an affidavit after the Wiebers

responded to FMH's motion for summary judgment explaining that she was increasing the reserves

"based on the medical bills, lost wages, out of pocket expenses and general damages. I was still

waiting for medical records and other information from the Wiebers at this time. Obviously,

reserves are not an indication of what a case is worth or valued at." Doc. 31 at ¶ 2. Reserves may

be relevant and admissible evidence,[7] but do not necessarily reflect valuation of a claim. Silva v.

Basin W., Inc., 47 P.3d 1184, 1189 (Colo. 2002) (en banc) ("[A] particular reserve amount does

not necessarily reflect the insurer's valuation of a particular claim."); Stephen S. Ashley, Bad Faith

Actions: Liability & Damages § 10:31 (2d ed. updated October 2019) (explaining that the amount

of a reserve "is supposed to reflect the adjuster's best estimate of the eventual cost of the claim to

the" insurer, and that "[w]ith a new claim, the adjuster's estimate is little more than a guess"); id.

(explaining that reserves set early in the claims process "constitute an opinion based on almost

pure speculation"); see also Anderson, 857 F. Supp. 2d at 907–908 (evidence that insurer had

offered to settle for less than it reserved on the plaintiff's UIM claim did not prevent summary

---

[7]This Court has explained that "[e]vidence related to reserves is generally relevant because the failure of an insurer to offer a reasonable amount to settle a claim, on a claim of bad faith breach of duty, might be evidenced by the insurer's setting aside a substantially greater amount of reserve for that claim." Burke v. Ability Ins. Co., 291 F.R.D. 343, 349 (D.S.D. 2013) (cleaned up and citation omitted); see also Kirchoff, 997 F.2d at 405 (holding that the district court did not abuse its discretion by admitting evidence that the insurer had set an internal "case estimate" valuing the plaintiff's claim at $300,000 but offered only $8,000 to settle the case).

judgment in a bad faith case where the value of the plaintiff's claim was fairly debatable and the claims adjuster explained that the reserve was an "arbitrary amount" since she had no way of evaluating the claim when she set it). Indeed, it would be odd for Beeler to determine what Robin's claim was worth before FMH had all the medical records or had someone with a medical background review the records. Whether Beeler's explanation is accurate might be a question of fact, but her mere notation on reserves does not in itself establish bad faith.

Second, FMH's decision not to interview Robin or ask her to undergo an IME does not establish bad faith. By the time Robin made a claim for UIM benefits, she was represented by counsel, her counsel did not suggest that FMH call Robin to conduct a recorded interview of her, and her counsel likely would have strong misgivings about any such interview occurring without his involvement. While never having done a recorded interview of Robin, FMH representatives had prior conversations with Robin about the claim, none of which were improper. Doc. 20-1 at 6–13. The decision by FMH not to do a recorded interview of a represented party is not in itself bad faith. Nor is it bad faith for FMH to have chosen to have a nurse do a records review in lieu of an IME.[8] FMH after all did not take the position, without an IME report, that Robin was malingering, was misdiagnosed, or had overtreated such that medical bills were not proximately caused by the car accident.

Third, the record is less than clear whether FMH did or did not consider the full amount of Robin's past medical expenses of approximately $87,000. Beeler's letter informing the Wiebers of FMH's decision not to pay UIM benefits acknowledged that the medical bills totaled nearly $87,000 but referenced "contractual adjustments" making the "related charges" just $43,548.46. Doc. 20-12. The letter then concluded with the opinion that the $250,000 Progressive payment

_____

[8]Robin underwent an IME at FMH's request on April 10, 2018, which is well after she brought this lawsuit. Doc. 26 at ¶ 29. The IME is not part of the record.

"fully compensates [Robin] for her injuries and inconveniences." Doc. 20-12. Even if FMH had considered the full amount of Robin's bills and had undervalued the cost of her future medical costs as the estimate from Sanford seems to suggest, it remains fairly debatable whether Robin's claim was worth more than the $250,000 Progressive payment combined with waiver of the $10,000 in medical payments coverage. FMH may have been stingy, but a reasonable jury with the information FMH had in late June 2017 could have awarded $260,000 for Robin's injuries or could have awarded more. The valuation of Robin's claim in June 2017 as being at or alternatively above $260,000 seems fairly debatable regardless of whether medical expenses are taken to have been $87,000 or closer to $43,000.

Fourth, the essence of Robin's bad faith claim seems to be that FMH undervalued the damages the Wiebers could recover for Robin's pain and suffering, loss of enjoyment of life, aggravation of a preexisting condition, disability and disfigurement, future lost wages, loss of earning capacity, and for Darin's loss of consortium. Doc. 25 at 16–18. The Wiebers assert that FMH "wholly failed to consider" these potential damages, but that assertion is not entirely accurate. The claims notes indicate that Beeler at least considered Robin's future lost wages, Doc. 20-1 at 2, and Beeler's note about increasing the reserves says she made the increase "based on the medical bills, lost wages, out of packet [sic] expenses and general damages." Doc. 20-1 at 5. Beeler also submitted an affidavit after the Wiebers replied to FMH's motion for summary judgment saying that FMH considered "general damages such as pain and suffering, disability and disfigurement, loss of enjoyment of life, and other general damages in valuing this case." Doc. 31 at ¶ 3. While Robin believes that FMH undervalued her potential damages, it is difficult to quantify a potential jury award with any certainty. See Williams v. Hartford Cas. Ins. Co., 83 F. Supp. 2d 567, 575 (E.D. Pa. 2000) (noting that reasonable minds could differ in quantifying claim for pain

and suffering, loss of life's pleasures, and loss of consortium); <u>Keefe v. Prudential Prop. & Cas. Ins. Co.</u>, 203 F.3d 218, 226 (3d Cir. 2000) ("The pain and suffering/general damage elements of a personal injury claim are inherently flexible and subject to different and potentially changing evaluations." (cleaned up and citation omitted)); <u>Bellville v. Farm Bureau Mut. Ins. Co.</u>, 702 N.W.2d 468, 482 (Iowa 2005) (explaining that "an insurance company simply cannot be expected, at its peril, to predict the exact amount a jury will award"). Moreover, some of the medical records FMH filed appear inconsistent with Robin's testimony that, in the summer of 2017, she still had "constant" ankle pain and difficulty with steps and uneven ground. On June 7, 2017, Robin told the physician's assistant (PA) to her surgeon that her pain was a 1 to 2 "at its worst," although she still had aching and burning discomfort with increased activity. Doc. 32-3 at 1. The PA's notes say that Robin was "minimally symptomatic," and seemed "reassured with review of her x-rays as well as physical exam review." Doc. 32-3 at 2. At a December 7, 2016 appointment with her surgeon, Robin reported "just . . . a little bit of aching and swelling primarily after walking in the morning time." Doc. 32-4 at 1. She also said that she used to have some difficulty with stairs but that "her physical therapist has helped her with that quite a bit." Doc. 32-4 at 1. At a doctor's appointment on July 27, 2016, Robin rated her ankle pain a zero out of ten. Doc. 32-5 at 2. As for Robin's neck injury, there are no documents in the record suggesting a need for neck surgery because of the accident.

In addition to their argument about an inadequate investigation, the Wiebers include a section in their brief entitled: "FMH's Additional Actions/Inactions Evidencing Bad Faith." Doc. 25 at 21. The Wiebers' main argument in this section is that FMH's delayed response to their November 2016 letter asking FMH to "substitut[e] its draft or waiv[e] its subrogation rights" is evidence of bad faith. But the Wiebers did not have a settlement offer from Progressive in

November 2016, which is a condition precedent to receiving UIM benefits. See Dziadek v. Charter Oak Fire Ins. Co., 213 F. Supp. 3d 1150, 1163 (D.S.D. 2016) (a person seeking UIM coverage must satisfy certain conditions precedent, including notifying the insurer of the insured's intent to accept the underlying liability limits, allow the insurer an opportunity to exercise its Schmidt/Clothier rights, make a formal demand for UIM benefits, and show damages above the limits of the underinsured motorist); Emp'rs Mut. Cos. v. Nordstrom, 495 N.W.2d 855, 857 (Minn. 1993) ("Until there has been a recovery from the tortfeasor's insurer, the claimant's underinsured claim simply has not matured."). Thus, while FMH should have responded to the letter out of courtesy and under SDCL § 58-33-67, the letter didn't require FMH to exercise its Schmidt/Clothier rights at that time. The Wiebers' notice to FMH triggering Schmidt/Clothier came through a letter dated January 31, 2017, advising FMH that Progressive would pay its $250,000 policy limits if FMH approved and waived its Schmidt/Clothier rights. Doc. 20-3. FMH through Beeler responded on February 8, 2017, just nine days later, seeking additional information. There was a 65-day delay after January 31, 2017, before FMH waived its Schmidt/Clothier rights, but 30 days of that time resulted from a delay in the Wiebers' counsel's response to FMH.

When viewed in a light most favorable to the Wiebers, the evidence to justify a bad faith claim against FMH is thin. Whether the Wiebers' recoverable damages exceed $260,000 is certainly possible and perhaps probable, but still fairly debatable. FMH should have in courtesy and under statute responded to the November 14, 2016 letter from the Wiebers' counsel, but conditions precedent to a UIM claim had not been met at that point. FMH could have started its investigation into the extent of Robin's injuries earlier, and perhaps by doing so FMH could have more rapidly waived its Schmidt/Clothier rights. Much of what the Wiebers contend constitutes bad faith reflects an extension beyond what South Dakota law thus far has recognized to be bad

faith. See Zochert, 921 N.W.2d at 490 (bad faith must involve "an insurance company consciously engag[ing] in wrongdoing" (citation omitted)). But see Dakota, Minn. & E. R.R., 771 N.W. 2d at 629–30 (bad faith question generally is one for finder of fact). If this Court allows a bad faith claim to proceed to trial, this Court at a minimum will bifurcate the case with trial of the contract claim first. This Court wants to consider further, and perhaps will rule after hearing from counsel at a pretrial conference, whether as a matter of law summary judgment should enter for FMH on the bad faith claim.

### C. Count III: Intentional Infliction of Emotional Distress

Plaintiffs alleging intentional infliction of emotional distress in South Dakota must show four elements:

> 1. An act by defendant amounting to extreme and outrageous conduct;
> 2. Intent (or recklessness) on the part of the defendant to cause plaintiff severe emotional distress;
> 3. The defendant's conduct was the cause-in-fact of plaintiff's distress; and
> 4. The plaintiff suffered an extreme disabling emotional response to defendant's conduct.

Reeves v. Reiman, 523 N.W.2d 78, 83 (S.D. 1994) (citation omitted). South Dakota law sets a high bar for showing extreme and outrageous conduct. Harris v. Jefferson Partners, L.P., 653 N.W.2d 496, 500 (S.D. 2002) ("Proof under this tort must exceed a rigorous benchmark."); Richardson v. Richardson, 906 N.W.2d 369, 377 (S.D. 2017) (explaining that the "high threshold" for intentional infliction of emotional distress "prunes out nonmeritorious suits"). To be actionable, the defendant's conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." Fix v. First State Bank of Roscoe, 807 N.W.2d 612, 618 (S.D. 2011) (citation omitted). Whether a defendant's conduct is extreme and outrageous enough

to permit recovery is initially a question for the trial court. Id.; Richardson v. East River Elec. Power Coop., Inc., 531 N.W.2d 23, 27 (S.D. 1995). Only "[w]here reasonable men may differ, [is it] for the jury . . . to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." Richardson, 531 N.W.2d at 27 (citation omitted).

The Wiebers claim that FMH engaged in extreme and outrageous conduct by denying Robin's claim without a reasonable basis, failing to investigate and consider all possible elements of damages, and engaging in other unspecified "actions and inactions." Doc. 25 at 34. For the reasons discussed above, the Wiebers' bad faith claim is thin and may or may not survive summary judgment. The alleged conduct that the Wiebers contend was bad faith was not "so extreme in degree as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." Fix, 807 N.W.2d at 618.

### D. Count IV: Breach of Fiduciary Duty

The Wiebers acknowledge that there is no separate cause of action for breach of fiduciary duty in a first-party insurance case like this.[9] Doc. 25 at 31 n.4; Haanen v. N. Star Mut. Ins. Co., 1:16-CV-01007-CBK, 2016 WL 6237806, at *3 (D.S.D. Oct. 25, 2016). FMH is entitled to summary judgment on Count IV of the Wiebers' complaint.

### E. Count V: Unfair or Deceptive Trade Practices

---

[9]Mystifyingly, the Wiebers' expert report opined in two conclusory sentences that FMH owed such a duty to the Wiebers. Doc. 27-8 at 9. The Wiebers' expert report also purports to express opinions that there is a viable intentional infliction of emotional distress claim and claim under § 58-33-67 for unfair or deceptive trade practices. Doc. 27-8. If this Court allows a bad faith claim to get to the jury, any possible testimony by that expert will be confined and strictly regulated to ensure that the expert is not misinforming the jury about South Dakota law or what duties and obligations an insurance carrier has under South Dakota law.

The Wiebers allege that FMH violated SDCL § 58-33-67 by not responding to the November 2016 letter from their attorney within thirty days. Section 58-33-67 provides in relevant part:

> In dealing with the insured or representative of the insured, unfair or deceptive acts or practices in the business of insurance include, but are not limited to, the following:
>
> (1) Failing to acknowledge and act within thirty days upon communications with respect to claims arising under insurance policies and to adopt and adhere to reasonable standards for the prompt investigation of such claims[.]

SDCL 58-33-67(1). The Wiebers recognize that § 58-33-67 does not provide them with a private right of action. SDCL § 58-33-69 ("Nothing in §§ 58-33-66 to 58-33-69, inclusive, grants a private right of action."); Anderson, 857 F. Supp. 2d at 908. They instead argue that FMH's alleged violation of the statute is relevant to their bad faith claim.

As discussed above, FMH should have responded to the November 2016 letter, but at the time Progressive had not offered its limits of liability, so a requested response on waiver of Schmidt/Clothier rights was premature. Once Progressive offered its liability limits and FMH was so notified, FMH responded consistently to the Wiebers and their counsel within 30 days. Under these circumstances, the one-time violation of § 58-33-67 is not separately actionable as an unfair trade practice. Anderson, 857 F. Supp. 2d at 908; see also id. ("A violation of SDCL 58-33-67(1)—a provision that is focused on the adoption of reasonable standards to provide for the *timely* investigation of claims—does not prove either prong of the South Dakota bad faith test."). The Wiebers don't have a private right of action under § 58-33-67.

The Wiebers also argue that FMH's alleged violation of § 58-33-67 provides a basis for them to recover attorney's fees. Section 58-33-46.1 of South Dakota's chapter on unfair trade practices reads: "Any person who claims to have been damaged by any act or practice declared to

21

be unlawful by this chapter shall be permitted to bring a civil action for the recovery of all actual and consequential damages suffered as a result of such act or practice including reasonable attorneys' fees to be set by the court." SDCL § 58-33-46.1. The Wiebers do not appear to have sustained any damages from FMH not responding to the November 2016 letter. The Wiebers' attorney had to write another letter to FMH in January to advise of Progressive's tender of its $250,000 limits, which letter had to be sent to make a UIM claim regardless of the lack of response by FMH. The Supreme Court of South Dakota recently stated: "[W]hile SDCL 58-33-67(1) does not by its own terms grant a private right of action according to SDCL 58-33-69, a violation thereof provides a cause of action under 58-33-46.1." W. Nat'l Mut. Ins. Co. v. TSP, Inc., 904 N.W.2d 52, 60 (S.D. 2017). The Court held that the plaintiff in Western National could bring a claim for attorney's fees for the insurer's violation of § 58-33-67(1) even though the Court determined that the policy did not provide coverage. Id. at 60–61. It remanded the case to the trial court to determine "what portion, if any," of the plaintiff's attorney's fees "occurred as a result of" the insurer's violations of § 58-33-67(1). Here, there appears to be few, if any, attorney's fees that "occurred as a result of" FMH's violation of § 58-33-67(1) by failing to respond to Wiebers' counsel's November 2016 letter. This Court would prefer to hear from counsel at the pretrial conference and motion hearing as to what, if any, claim under § 58-33-67(1) remains in light of this Opinion and Order.

### F. Count VI: Punitive Damages

Count VI of the Wiebers' complaint seeks punitive damages under SDCL § 21-3-2. That section reads:

> In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, or in any case of wrongful injury to animals, being subjects of property, committed intentionally or by

22

> willful and wanton misconduct, in disregard of humanity, the jury,
> in addition to the actual damage, may give damages for the sake of
> example, and by way of punishing the defendant.

SDCL § 21-3-2. FMH argues that the Wiebers don't have a claim for punitive damages because

it is entitled to summary judgment on all of the Wiebers' other claims. Because this Court is

reserving ruling on summary judgment on a part of the Wiebers' bad faith claim, this Court will

likewise defer entry of summary judgment on the punitive damages claim.

### G. Count VII: Attorney's Fees

Count VII of the Wiebers' complaint requests attorney's fees under SDCL § 58-12-3. FMH

seeks summary judgment on this claim, arguing that the Wiebers can't recover attorney's fees

under § 58-12-3 because FMH did not act vexatiously or unreasonably by denying Robin's UIM

claim. See SDCL § 58-12-3 (providing for attorney's fees if the insurer's refusal to pay the full

amount of a loss was "vexatious or without reasonable cause" and "judgment or an award is

rendered for plaintiff"). This Court has concluded that it was fairly debatable in June 2017 whether

Robin's damages claim was worth more than $250,000 plus waiver of the $10,000 medical

payments extended.

A plaintiff can recover attorney's fees under § 58-12-3 for a breach of contract claim but

not for a bad faith claim. Kirchoff, 997 F.2d at 406–07 (8th Cir. 2003) (concluding that § 58-12-

3 does not allow recovery of attorney fees for a successful tort claim of bad faith because the statute

only applies to breach of contract claims); Brooks v. Milbank Ins. Co., 605 N.W.2d 173, 179–80

(S.D. 2000) (limiting an award of fees under § 58-12-3 to those attributable to an insured's contract

claim "and not those fees directly attributable to the tort action of first party bad faith refusal to

pay"). If the Wiebers were to recover on their breach of contract claim, they could potentially

recover attorney's fees under § 58-12-3 even if this Court determines that FMH as a matter of law

23

did not act in bad faith. As the Eighth Circuit has explained "a jury's adverse finding on a bad faith claim does not, as a matter of law, preclude a trial court from awarding attorney's fees under § 58-12-3." Tripp v. W. Nat'l Mut. Ins. Co., 664 F.3d 1200, 1206 (8th Cir. 2011). Instead, courts "should undertake a separate analysis to determine whether the insurer's refusal to pay was vexatious or without reasonable cause in those cases where a jury finds an insurer did not act in bad faith." Id.; see also id. at 1207 (finding no clear error in district court's decision, after jury rejected the plaintiff's bad faith claim, to award attorney's fees under § 58-12-3 where the insurance company offered to settle the claim for well below what the insurer believed the claim was worth); id. ("An award of fees under § 58-12-3 is warranted where the insurer made an inadequate investigation of plaintiff's loss," (citation omitted)); Bjornestad v. Progressive N. Ins. Co., 664 F.3d 1195, 1199–1200 (8th Cir. 2011) (concluding that district court did not clearly err in awarding attorney's fees under § 58-12-3 even though the jury did not find bad faith where, among other conduct, the insurer offered to settle with its insured in an amount less than it valued her claim). Thus, summary judgment on the attorney fee claim would be premature and is denied.

## H. Motion to Bifurcate

Rule 42(b) of the Federal Rules of Civil Procedure allows district courts to try claims or issues separately "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). District courts have broad discretion to bifurcate under this Rule, but they should consider the "preservation of constitutional rights, clarity, judicial economy, the likelihood of inconsistent results and possibilities for confusion." O'Dell v. Hercules, Inc., 904 F.2d 1194, 1201–02 (8th Cir. 1990). As the moving party, FMH must show the need for separate trials. Athey v. Farmers Ins. Exch., 234 F.3d 357, 362 (8th Cir. 2000) (holding that district court did not abuse its discretion by declining to bifurcate claims because the movant did not show prejudice).

FMH argues that the breach of contract claim must be tried separately from the other claims to avoid prejudice and promote judicial economy. It points out that the breach of contract claim could be dispositive of the Wiebers' case and argues that trying all the claims together would more than double the time for trial. FMH also contends that it would be prejudiced if all claims are tried together because the jury would hear evidence about Progressive's settlement with Robin and FMH's reserves, and because the jury could have difficulty keeping track of what information was and was not available to FMH when it decided to deny Robin's claim for UIM benefits. The Wiebers disagree, arguing that separate trials would be inefficient because the evidence on all claims overlaps and that courts have rejected the arguments of prejudice that FMH makes here. The Wiebers also argue that separate trials would prejudice them because they would be required to pay twice for testimony by medical providers and experts and would have to miss work on two occasions.

For the reasons explained above, this Court will bifurcate the contract action from any trial of a bad faith claim. The bad faith claim is supported by thin evidence, and indeed this Court has it under advisement whether summary judgment should enter on that claim. Trial of the amount to compensate Robin for personal injuries is readily separable from trial of the alleged bad faith through deficient investigation. If this Court allows the bad faith claim to survive summary judgment, it seems possible, and indeed efficient, to stage the trial in two halves before the same jury to avoid needing to call medical providers twice.

## III. Conclusion

For the reasons explained, it is

ORDERED that FMH's motion for partial summary judgment, Doc. 16, is granted in part and denied in part. It is further

ORDERED that, if this Court does not enter summary judgment on all claims other than the breach of contract claim, FMH's motion to bifurcate, Doc. 21, is granted. It is further

ORDERED that the parties contact this Court's judicial assistant to set a conference call with the Court to schedule a pretrial conference and trial.

DATED this 12ᵗʰ day of December, 2019.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE